No. 32,134

JOHN ALSTER et al., *Appellees*, v. JOSEPH L. ALLEN, doing business as CLOVER LEAF DAIRY, *Appellant*.

(42 P. 2d 969)

Opinion filed April 6, 1935.

*Joseph J. Dawes,* of Leavenworth, *A. Harry Crane* and *Ward D. Martin,* both of Topeka, for the appellant.

*Lee Bond,* of Leavenworth, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to enjoin the defendant from operating a creamery station in such a manner as to constitute it a nuisance to the plaintiffs.

It appears that in 1928 defendant purchased three town lots at the southwest corner of Fifth and Pottawatomie streets in Leavenworth and set about the erection of a creamery station thereat. The city has no zoning ordinance. The locality was mainly, but not exclusively, a residence district. There were some small business establishments nearby. Immediately west of the creamery station, with only a ten-foot driveway between, was the home of one of these plaintiffs. Nearly all the residences of plaintiffs in the vicinity antedated the creamery station by many years.

Defendant developed his creamery and dairy business rapidly until, when this cause was tried, he was buying dairy products from 200 farmers, manufacturing 15,000 pounds of butter and 15,000 pounds of ice cream per month, bottling 1,000 to 1,200 quarts of milk daily, and was giving employment to seventeen people. His business building was a two-story structure of brick and concrete. Defendant made two additions to it and added an ice-making machine during the two years which elapsed from the inception of this lawsuit to its conclusion in the district court.

As defendant's business grew it began to annoy the neighboring residents. The usual early morning bustle of trucks and handling of milk cans and loud voices of employees disturbed the former quiet of the vicinity. These noises lasted about two hours, beginning about 2 o'clock a. m. in summer and about 3 o'clock a. m. in winter. Quite naturally the noises at such unseasonable hours prevented some of the plaintiffs from sleeping, and some of them were rendered nervous thereby.

At first the machinery in the creamery station was driven by electric power; but in December, 1931, defendant installed a fifty-horsepower semi-Diesel engine which greatly added to plaintiffs' disquiet. Besides the popping of its exhaust, and the fumes and disagreeable vapors which it emitted, and which frequently permeated the houses of some of the plaintiffs, the engine caused the ground thereabout to vibrate, the houses to shake, the dishes to rattle, and the very beds to shake, so that living conditions became unbearable to plaintiffs.

The aggrieved parties at first appealed to the public authorities; and functionaries of the local and state boards of health examined the premises; but as the creamery station was maintained in sanitary fashion there was nothing the health officials could do about it.

Hence this lawsuit, to enjoin the business as a nuisance.

Plaintiffs' petition alleged the foregoing facts. Defendant's answer contained a general denial, stated the extent and character of his business, and further alleged:

"8. The dairy business of the defendant is a necessary and legitimate business. In the successful conduct of said dairy business, the defendant finds it necessary to operate, and does operate trucks and milk wagons, does load and unload milk cans and the products of said dairy.

"9. It is impossible to conduct said business without making some noise.

"10. Said defendant finds it necessary in the proper conduct of said business; and does operate said dairy at all hours of the day and night in some parts of the year.

"11. Some slight vibrations and noises are necessarily made by the machinery and the exhaust of the engine.

"12. A low grade of fuel oil is used in the engine and the fumes of the exhaust are only the products of the combustion of kerosene oil. . . .

"13. In the conduct of the said dairy business no more noise is made than is necessary and inherent in the very nature of said business.

"14. Whatever annoyance is caused by the operating of the business of the said defendant to the plaintiffs, as alleged by them in their petition, comes under the legal classification of *damnum absque injuria*.

"15. To cut down the operating expenses the following machinery has been installed by the defendant in said dairy plant: One fifty-horsepower Weber oil engine, equipped with one three-section patented Gold silencer, weighing 2,500 pounds, . . .; one 24-kilowatt alternating-current generator; three refrigerating plants; one ice crusher; one steam boiler, 20 horsepower; one 500-pound churn; bottle washers; can washers; pasteurizing vats and various other pieces of machinery and equipment. Said equipment costing over $20,000.

"16. Modern methods and appropriate machinery and appliances only are used by the said defendant in the conduct of his business. Said plant and machinery as now installed and operated is not a nuisance, nor a source of danger to the health and welfare of the said plaintiffs, nor is the annoyance caused by conducting said business excessive, or of such nature as to entitle said plaintiffs to an injunction as prayed for by them.

"17. Defendant has courteously listened to all complaints made to him by each and every one of said plaintiffs and has endeavored and does now endeavor to conduct his business in a manner that will give said plaintiffs the least amount of annoyance."

The cause was tried without a jury. Evidence was adduced at length by the parties. The court took the cause under advisement, but eventually judgment was entered for plaintiffs substantially as

prayed for. Defendant filed the usual motions, including one to clarify and modify the judgment. This last motion was sustained in part, and the main features of the final judgment read:

". . . The said defendant herein, its successors, grantees or assigns, be and they are hereby enjoined and restrained from operating or running said Diesel engine or any other engine or machinery causing such vibrations as will jar, shake or otherwise disturb or put to great inconvenience, annoyance or damage the property or peaceable enjoyment thereof by said plaintiffs;

"From loading or unloading milk cans and operating trucks or other vehicles in and upon said premises so as to cause loud and violent noises sufficient to disturb the peace and quiet of said plaintiffs;

"From operating said plant in such a manner as to cause disagreeable, obnoxious, dangerous or unhealthy fumes and smoke or gases to permeate the houses of said plaintiffs to their discomfort, annoyance and inconvenience, and that said plaintiffs recover their costs herein expended, and that execution issue therefore, . . ."

Defendant appeals, contending first that the evidence did not support the judgment. The most significant features of plaintiff's evidence have been summarized above and it would serve no purpose to repeat or enlarge upon it. Representatives of twenty-one families residing in the neighborhood testified in the case. Defendant quotes some of these witnesses who testified that the operation of the creamery station caused them no annoyance until the semi-Diesel engine was installed. Others, however, testified that soon after defendant commenced business operations there were disquieting noises of men's voices, the rattling of milk cans, and coming and going of trucks at two o'clock and three o'clock in the morning and that this unseasonable clamor usually lasted for two hours every morning. This court holds that the issuable facts which were resolved in favor of plaintiffs were abundantly supported by the evidence.

Defendant next invokes the equitable rule that a lawful business in an authorized place will not be enjoined on the mere ground that it causes *some* inconvenience to those living in the neighborhood. To be sure there is such a rule. In *Shepler v. Kansas Milling Co.*, 128 Kan. 554, 278 Pac. 757, we said:

"Certain natural rights of persons may be curtailed which the sufferer must sustain without other return therefor than the manifold benefits which inure to him as a citizen privileged to reside in and earn his livelihood in an orderly community of his fellows. Typical of these are the noise of trains or street cars, the rumbling of early morning traffic, the cutting off of ancient lights and the erection of obstructions to his view. Such instances of *damnum absque injuria* could be indefinitely multiplied. (See *Lapere v. Luckey,* 23 Kan. 534;

*Anderson v. Bloomheart,* 101 Kan. 691, 168 Pac. 901; 1 C. J. 1227-1229; 17 C. J. 1125 and citations; 1 R. C. L. 318; 1 Bouvier, 3d ed., 754.)" (pp. 555, 556.)

But in that same case we also said:

"Appellee cites various cases where the freedom of an owner to devote his property to a use of his own choosing has been judicially interfered with as a nuisance. Of course, there are many such cases, as where gases from a brick plant destroyed vegetation (*Fogarty v. Pressed Brick Co.,* 50 Kan. 478, 31 Pac. 1052); where smoke, dust and cinders caused substantial injury to neighboring property (*Phillips v. Brick Co.,* 72 Kan. 643, 82 Pac. 787); and where poisonous fumes from an oil refinery passed over neighboring lands (*Helms v. Oil Co.,* 102 Kan. 164, 169 Pac. 208)." (p. 556.)

In *McMullen v. Jennings,* ante, p. 420, 41 P. 2d 753, decided March 9, 1935, where the question was whether so useful an institution as a grain elevator might become a nuisance to the complainant on account of the way it was operated, it was held:

"In the operation of such an elevator, it is a nuisance to unreasonably pollute the air with dust having a foul odor or with other offensive substances, to the annoyance, damage or harm of the owners or occupiers of adjacent lands in the use and enjoyment of the properties, and in determining whether it is unreasonable, the annoyance is measured by what would unreasonably disturb the ordinary and usual comforts of persons of normal tastes and sensibilities." (Syl. ¶ 2.)

The law books are laden with cases to the same effect. In *Clay County Ice Co. v. Littlefield,* 187 Ark. 911, the syllabus in part reads:

"Operation of an ice plant in a residential district *held* a nuisance and should be restrained where it materially injured property and annoyed the residents, regardless of how well it was constructed or conducted." (¶ 1.)

In the closely analogous case of *Mitchell v. Flynn Dairy Co.,* 172 Ia. 582, the syllabus and its pertinent headnote read:

"2. The carrying on of a private plant in such a manner as to unreasonably disturb the sleep of the neighborhood (a residence part of a city) creates a private nuisance which may be abated. (See 5078, Code, 1897.)

"PRINCIPLES APPLIED. A dairy and ice-cream plant, located in a residence neighborhood, was operated in some form during every hour of the day. One hundred thirty teams came and went each day, most of them passing through a public fourteen-foot, brick-paved alley west of the plant, where they unloaded. The defendant had practically taken possession of this alley for the purposes of its business. One private residence, with one east door and five east windows, faced the alley, only a few feet away. The loading and unloading of milk bottles and cans commenced about 1:30 a. m. and continued into the forenoon. Another unloading platform was on the east of the building. There was profanity and some obscenity among the teamsters about

the plant. A steam exhaust added to the noise. An ice crusher, handling 350 tons of ice per month, added much to the noise. The congestion was so great at times that the sidewalk was used for unloading. The alley especially was offensive with manure. Residents 100 feet distant were disturbed. *Held*, to show a private nuisance."

In *Kobielski v. East Side Creamery Co.*, 222 Mich. 656, the headnote reads:

"In a suit by the owners of a two-family flat to abate a nuisance claimed to be created by defendant by operating its creamery plant in a residential section of a city at night in such a way that the noises keep plaintiffs and their tenants awake, and by reason thereof plaintiffs are unable to keep tenants in their other flat, evidence *held*, sufficient to entitle plaintiffs to a decree."

See, also, *Washington Cleaners v. Albrecht*, 157 Md. 389.

On the question of noise incident to the lawful operation of an industrial business as an element of nuisance, see notes in 17 L. R. A., n. s., 287; 44 L. R. A., n. s., 236; 23 A. L. R. 1407; and 90 A. L. R. 1207.

It is next contended that the injunctive order which the court issued is indefinite and uncertain. It seems to us that in the light of the evidence the court's decree is about as specific and definite as language could make it. In *Washington Cleaners v. Albrecht*, supra, an injunction had been issued against the operation of a cleaning and dyeing plant as it had theretofore been conducted to the annoyance of a neighborhood which was largely, but not exclusively, residential. On appeal the court said:

"Appellant complains that the decree is too vague and indefinite in that it does not point out to it how it is to rearrange its plant so as to comply with its terms. But it is no part of the function of a court of equity to tell the appellant how to run its business. Such a court has the undoubted power to prevent it from so using its property as to deprive others of the reasonable enjoyment of their properties, or in appropriate cases it may grant affirmative relief by requiring a wrongdoer to remedy the mischief he has caused, but beyond that it cannot go. To require it, in such a case as this, to conduct an inquiry involving the employment of highly skilled and technically trained advisors and to formulate plans which would enable appellant to conduct its plant so as to conform to its decree verges upon absurdity. When, therefore, the court restrained appellant from using varnalene or gasoline 'in such quantity and manner' as to 'be deleterious to the health of the neighborhood' it did precisely what it was authorized to do, no more and no less." (p. 400.)

The record contains no error and the judgment is affirmed.